IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

IN THE MATTER OF:                )
THE CHURCH OF OMAHA,             )          Case No. BK11-83138
A UNITED PENTECOSTAL             )
CHURCH, INC.                     )
                                 )
A Nebraska Non-Profit Corporation )
          Debtor in Possession   )          Chapter 11

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

# PLAN OF REORGANIZATION

## WITH COMBINED DISCLOSURE STATEMENT

## FOR

## THE CHURCH OF OMAHA,
## A UNITED PENTECOSTAL CHURCH, INC,

## A Nebraska Non-Profit Corporation

## Debtor in Possession

**(Small Business)**

Prepared and Submitted by:
DAVID G. HICKS,  #16853
ROXANNE M. ALHEJAJ, #23353
POLLAK & HICKS, P.C.
216 Overland Wolf Centre
6910 Pacific Street
Omaha, Nebraska  68106
Telephone:  (402) 345-1717
Facsimile:   (402) 444-1724
DHicksLaw@aol.com
Roxanne_law@cox.net
Attorneys for Debtor and Debtor in Possession

Dated:    June 29th, 2012

## DISCLOSURE STATEMENT//PLAN OF REORGANIZATION

### Preamble to the Plan

The Chapter 11 case of The Church of Omaha, A United Pentecostal Church, Inc., a Nebraska non-profit corporation ("TCOO") was filed on December 29, 2011 in order to stave off a sale of its real estate properties set for January 3, 2012 by the major creditor, the Evangelical Christian Credit Union ("ECCU"). Certain promissory notes between TCOO and ECCU had matured and the parties were negotiating regarding curing an existing default and having discussions regarding refinancing the loan. Ultimately the parties were not able to reach a timely agreement.

*The current economic crisis is hitting Christian Organizations hard. Keeping the church financially healthy while staying true to its mission requires honesty, courage and planning as well as faith.* [1]

In this proposed Plan, the terms "Debtor In Possession" or "Debtor" are used interchangeably and refer to TCOO. TCOO is a Nebraska non-profit corporation.

Moreover, the Debtor is a small business debtor as provided in 11 U.S.C. Sec. 101(51D) and therefore, pursuant to 11 U.S.C. 1125(f), is combining its Disclosure Statement with this Plan rather than preparing, filing and circulating a separate disclosure statement document. Unless the Court determines that this Plan does not provide adequate information or otherwise orders, this Plan will serve the dual function of both Plan and Disclosure Statement.

The above named Debtor in Possession proposes the following Plan under 11 U.S.C. Sec 1121 and related provisions, pursuant to its Petition filed on or about

---

[1] 2009 Leadership Education at Duke Divinity- Faith and Leadership).

December 29th, 2011.  The Debtor is the proponent of this Plan within the meaning of 11

U.S.C. Section 1129.  Federal Bankruptcy Law, other federal laws of the United States of

America and applicable non-bankruptcy laws of the State of Nebraska shall be the

applicable laws governing the implementation, interpretation and enforcement of this

Plan.

This Plan is submitted in good faith and the Debtor reserves the right to modify its

Plan in the future as provided by 11 U.S.C. Sections 1127.

## DISCLOSURE STATEMENT

### Introduction

The information contained in this Disclosure Statement is included herein for

purposes of soliciting acceptances of the Debtor in Possession's Plan of Reorganization,

and may not be relied upon for any purpose other than to determine how to vote on the

Plan.  No person may give any other information or make any other representations

regarding the Plan or the solicitation of acceptances of the Plan.  The information

contained in this Disclosure Statement is believed to be accurate and truthful to the best

of the Debtors in Possession's knowledge, information and belief, as of the date hereof.

As to any and all contested matters, adversary proceedings, or other actions,

whether now pending, or filed in the future, nothing contained in this Disclosure

Statement shall constitute or be construed as an admission of any fact or liability,

stipulation or waiver, but rather as statements made in settlement negotiations.  This

Disclosure Statement shall not be admissible in any non-bankruptcy proceeding or in any

adversary proceeding.  Nothing contained in this Disclosure Statement is intended to be,

nor should be construed as, conclusive advice on tax issues or consequences or any other

legal effects of the Plan.

This Disclosure Statement has been prepared in accordance with Section 1125 of the United States Bankruptcy Code (as modified by BAPCPA's sub-section 1125(f), in accordance with Rule 3016 of the Federal Rules of Bankruptcy Procedure, and consistent with the disclosure requirements outlined in *In Re Metrocraft Publishing Services, Inc*., 39 B.R. 567 (Bkrtcy. 1984).  It has <u>not</u> been prepared in accordance with securities laws or other non-bankruptcy law.

## A.  <u>Business Background/Overview</u>

TCOO is a closely-held, Nebraska non-profit corporation, which has non-profit status for taxation purposes and is in good standing with the Office of the Nebraska Secretary of State.  Its principal business is operating The Church of Omaha, located at 3715 North 104th Avenue, Omaha, Nebraska.  It is run by Pastor Myron Powell, President; Treasurer, Ron Christensen; and a Board of Trustees, all consistent with the requirements of *21 Neb. Rev. Stat. Secs. 21-1901 et seq. (Reissue of 2007), as amended*, and commonly known as the Nebraska Nonprofit Corporation Act.  The Church has been operated by Pastor Myron Powell since approximately April 2010.  The Church has been operating as a United Pentecostal Church for thirteen (13) years, since approximately February, 1999.

TCOO had suffered an acute and extremely detrimental financial impact when the immediate prior Pastor abruptly left the Church taking approximately fifty members from the congregation directly and proximately resulting in an average loss of approximately $1,000 per week in reduced giving.  Pastor Myron Powell had the duty of rebuilding the congregation and thereby rebuilding sources of income through tithing during tough economic times.

Because of these and other factors, combined with the national economic downturn as a whole, TCOO got behind in its obligations to ECCU.  ECCU perceived its duty to its various constituencies as being the implementation and operation of a policy of an aggressive and vigorous liquidation of delinquent accounts.  Accordingly, ECCU set a sale date of TCOO's real estate, leading to TCOO's Chapter 11 filing when negotiations broke down.  The real estate in question consists of two separate parcels, both of which

serve as collateral for ECCU's loan.  Once parcel includes both the building and grounds of the church and the second parcel is the buildings and grounds of the parsonage.  The loss of the real estate would therefore have permanently ended TCOO and Pastor Powell's mission of rebuilding.

TCOO has taken serious and effective steps to improve its financial soundness both by increasing income and reducing expenses.  TCOO's congregation size has substantially improved, it cut back on missionary programs to reduce costs, and has begun operating a daycare, Little Acorns, in order to obtain additional cash flow opportunities.  It is operating profitably and the business is able to complete some much needed repairs to the Church Building.

TCOO has retained its membership in ECCU which gives it "…access to all of ECCU's financial services and resources, plus the expertise of professionals who understand ministry and are uniquely positioned to develop customized financial solutions …".[2]

TCOO has successfully operated under the auspices of Chapter 11 for approximately six months, employees and monthly expenses are paid on an ongoing and regular basis and court approved adequate protection payments to ECCU have commenced. Debtor desires to complete its reorganization process quickly, economically, expeditiously and feasibly.  Accordingly, TCOO submits this Plan. The Debtor in Possession seeks Court approval of its Plan.

The Plan provides three classes of claims; all impaired, but all to be paid in full. Since TCOO is a non-profit corporation, there is no class of equity holders, nor are there tax liability issues.

## B.  Filing The Case

Initially, TCOO filed its Chapter 11 petition on December 29, 2011 in order to stay the pending and imminent sale of its real estate while concomitantly providing time to explore its options for financial survival.   Since then, Debtor has established a Debtor

---

[2] www.eccu.org/about history - membership section

in Possession Bank Account, obtained secured creditor consent to use cash collateral in its ongoing business operations, attended its Initial Trustee Interview with the United States Trustee, attended its 11 U.S.C. Sec. 341 meeting of creditors, filed its monthly operating reports, paid the U.S. Trustee its quarterly fees and negotiated settlements with key creditor constituencies.   After successfully operating for the past six months, TCOO is submitting this proposed, combined small business plan/disclosure statement.

## C.  **Operation**

With the protection of the automatic stay from adverse creditor action, TCOO has reached agreements with some creditors and this Plan comports with those agreements. Even those creditors with whom no agreement has been reached are receiving the same that would be possible under a liquidation scenario, thereby satisfying the best interest of creditors test, all as examined in greater detail in the Liquidation Analysis Section of this Disclosure Statement.

TCOO continues to be operated by Pastor Myron Powell, an ordained Pentecostal minister.  The Chapter 11 process has enabled TCOO to re-organize, increase cash flow, reduce and control overheads and develop a clear strategy for the future.
TCOO is realizing steadily improving income and has smoothed out its overheads – and thus its cash flow - by operating the daycare business at almost full capacity and substantially increased membership since filing.

TCOO intends to continue operating all segments of its business for the purposes of paying its creditors pursuant to the terms of the Plan and reorganization efforts.  With the restructured payment plan proposed in the Plan, TCOO anticipates being able to make its proposed distributions to creditors all as provided in greater detail below and in its Plan.

## D.  **Income Tax Consequences of the Plan**

**This description of tax consequences is for informational purposes only. Only the principal consequences of the Plan for the Debtor in Possession and for**

Holders of Claims who are impaired and thus entitled to vote to accept or reject the Plan are described, albeit in generalities, below.  **No opinion of tax counsel or CPA has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service ("IRS") or the Nebraska Department of Revenue ("NDR"), or any other tax authorities has been sought or obtained with respect to the tax consequences of the Plan.**   The Debtor in Possession is not making any representations regarding any particular tax consequences of the confirmation of the Plan and/or its subsequent consummation, as to any claim holder, and is not rendering any form of legal opinion as to such tax consequences. **Each holder of a Claim is strongly urged and encouraged to consult its own tax advisor regarding any and all tax consequences of the transactions described in this Disclosure Statement, in the Plan, and/or in the Confirmation Order.**

### (i)   Federal Income Tax Consequences to the Debtor(s)

It is expected that the impact of tax issues on TCOO will be non-existent.  There is no tax avoidance agenda in the Plan, nor was there any such motive in seeking relief under title 11.  Moreover, the Debtor is a non-profit corporation, exempt from paying taxes.

Cancellation of Debt ("COD") income will not be an issue in this case because this Chapter 11 proceeding would be subject to the insolvency exception of COD income. Moreover, no new entity is being created in the Plan. No shares are being transferred to new owners, as there are no shareholders in TCOO, and the estate is not acquiring any new assets by merger, acquisition or otherwise.

### (ii)      Federal Income Tax Consequences to Claim Holders.

The income tax consequences of the transactions contemplated by the Plan to a Claim Holder will depend upon a variety of factors, including the characterization and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan; the manner in which a holder acquired a claim; the length of time the Claim has been held; whether the Claim Holder has taken a bad debt deduction with respect to any portion of the Claim; the method of tax accounting of the

Claim Holder; whether the Claim is an installment obligation for federal tax purposes; and other factors.  For these and other reasons, **Claim Holders should consult their own tax advisors for information that may be relevant to their particular situation and circumstances and seek independent professional tax advice as to the particular tax consequences to them of the transactions contemplated by the Plan.**

### E.  LIQUIDATION ANALYSIS

Virtually all significant assets of TCOO are subject to the liens of ECCU and First National Bank of Omaha.  The assets as set forth on TCOO's Petition and Schedules (Doc.1) (collectively hereinafter referred to as the "Schedules") provide as follows:

(a)  TCOO owns real estate at its principal business location, Church located at 3715 North 104th Avenue, Omaha, Nebraska and Parsonage located at 10313 Mary St, Omaha, NE 68122, both consisting of building and land.  The current market value from a 2010 appraisal by Mitchell & Associates, Inc. ($950,000.00) for the Church and current assessed value ($155,058.00) for the Parsonage (aggregate value of $1,105,058.00) are substantially more than the indebtedness it secures to ECCU ($794,264.01 based on Proof of Claim #3).

(b) Other assets (non-real estate) have an aggregated orderly liquidation value in the estimated amount of $125,458.56.  These are encumbered by a lien of First National Bank of Omaha in the amount of $15,105.10 (Proof of Claim No. 2).

(c)  After allowing for these liens, there remains a gross liquidation value in the corporate assets of $440,168.58.  As a corporate entity, TCOO is not entitled to claim any exemptions.

Therefore, there would be a full distribution available for general unsecured creditors in a liquidation scenario.  Likewise, this Plan provides for a full distribution to allowed claims of creditors, while avoiding the negative consequences of liquidation such as a closed church, empty buildings and laid off employees, all clamoring for scarce resources in the context of a depressed liquidation market.

It is believed that the assets, liabilities and exemptions of TCOO were accurately reported in its Schedules.

**The Plan proposes to pay allowed, general unsecured claims (Class 5) a 100.00% distribution.**

Clearly, it is consistent with the best interest of creditors for the case to proceed as a reorganization as opposed to a liquidation proceeding.  It is clear that creditors would be well served to vote in favor of accepting the Plan.

## F. FEASIBILITY AND BEST INTEREST OF CREDITORS

### Financial Data/Cash Flow Projections

Debtor submits Financial Analysis/Cash Flow Projections – prepared by Treasurer Ron Christensen, President Pastor Myron Powell and the Board of Trustees.   - in support of this proposed Plan of Reorganization and to enable creditors to evaluate the feasibility of the Plan. Both forward looking and historical information are provided, including the "Proposal for Continued Sustainable Growth" and "Monthly Income/Expense Report".  The forward looking Proposal for Continued Sustainable Grow is attached hereto as Exhibit "A".  The historical Monthly Income/Expense Report is attached hereto as Exhibit "B".  Exhibits "A" and "B" are hereby incorporated as a portion of this Disclosure Statement.

Additionally, the Debtors in Possession have filed Monthly Operating Reports with the U.S. Bankruptcy Court since the inception of this case.  Those are available online from PACER or will be provided upon a timely request to Debtor's counsel.

The aggregate financial/cash flow projection information clearly demonstrates the viability of TCOO as an ongoing entity and is clear and convincing evidence of the feasibility of the proposals contained in the Plan.

## G.  REVIEW OF PROPOSED PLAN

The proposed Plan/Disclosure Statement has been filed with the United States

Bankruptcy Court for the District of Nebraska as _ECF Doc. No. _____ in the case and

can be reviewed on line via PACER.  Moreover, copies of the proposed

Plan/Disclosure Statement are available from Debtor's counsel upon request, for the

purposes of information and review only and not for the purpose of soliciting its

acceptance at this time.  Additionally, this being a small business case, the proposed

Plan is also combined and provided with this Disclosure Statement, but again for

information and review only; solicitation of the Plan's acceptance will come only

after the Court has approved the adequacy of the Disclosure Statement.

## H.  SOLICITATION/VOTING PROCEDURES

Under Section 1124 of the Bankruptcy Code, a class of claims or interest that is
impaired (and deemed allowed) is entitled to vote to accept or reject the Plan.  Classes 1,
2 and 3 under the proposed Plan are impaired.  If the impaired classes approve this
Proposed Plan, then Confirmation and payments will follow.  If said impaired classes
reject the Plan, Debtor may seek to amend the Plan or to confirm it over objection via
appropriate Order of the Court.

Upon the Court's approval of the adequacy of this Disclosure Statement, the
Debtor in Possession will solicit acceptance of the Plan.  ***Ballots should be sent to David
G. Hicks at Pollak & Hicks,  216 Overland Wolf Centre, 6910 Pacific Street, Omaha,
NE  68106*** by close of business (5:00 p.m. CDT) on _____, 2012.  Ballots
received after that time may not be counted.

## I.  INTERNET ACCESS TO BANKRUPTCY COURT DOCUMENTS

Any and all documents filed with the Bankruptcy Court in this Chapter 11 case, as
well as other bankruptcy documents and information may be found, downloaded and
printed from the website for the United States Bankruptcy Court for the District of

Nebraska, found at ec*f.neb.uscourts.gov* or by logging on to Pacer, or by requesting same from David G. Hicks, counsel for the Debtors in Possession.

## J.  RECOMMENDATION TO APPROVE

For all of the reasons set forth in the Plan and in this Disclosure Statement, the Debtor believes that rapid confirmation, implementation and consummation of the proposed Plan is preferable to all other alternatives.  Accordingly, Debtor urges all Creditors, to not object to the adequacy of this Disclosure Statement and to approve/vote in favor of the Plan. It is the Debtor's opinion that any claim objecting to the adequacy of the disclosure statement or any class voting to not approve the Plan is only obstructing the other creditors and parties in interest from receiving prompt and equitable distributions of their proposed payments.

# PLAN OF REORGANIZATION

## ARTICLE 1

### Classification of Claims and Interests

(a) – Class 1 -    Class One consists of allowed claim of Evangelical Christian Credit Union ("ECCU"), which claim is over-secured and which claim is ***impaired***.  Said secured creditor, ECCU, having valid liens against real property of the Debtor, shall retain those liens until such time as its allowed, secured claims are extinguished by payment as provided herein, or as otherwise provided herein.

(b ) – Class 2 -    Class Two consists of the allowed claim of First National Bank of Omaha, which claim is over-secured and impaired**.**

Said secured creditor, First National Bank of Omaha, having valid liens against non-real property of the Debtor, shall retain those liens until such time as its allowed, secured claims are extinguished by payment as provided herein, or as otherwise provided herein.

(c) – Class 3 -   Class Three consists of the allowed general unsecured claims and which claims are ***impaired***.

## ARTICLE II

## Identification of Impaired and Unimpaired Claims and Interests

(a) – Unimpaired Claims and Interests.   There are no claims or classes of creditor which are unimpaired.  Accordingly, pursuant to 11 U.S.C. Sec. 1126(f) there are no claims and interest holders that are conclusively presumed to have accepted the Plan and whose votes will not be solicited.

(b) – Impaired Claims and Interests.   Classes 1, 2 and 3 are impaired. The impairments exist in various ways.  The Plan proponent shall thus seek acceptance of the Plan from those classes.  According to Section 1126 of the Bankruptcy Code, an impaired class of claims shall have accepted the Plan if the proposed Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims of such classes and that have timely and properly voted on the Plan.  The aforesaid impaired classes will be solicited with respect to the Plan.

(c) – Administrative Claims & Priority Tax Claims.   Given that the Debtor is a non-profit corporation, the only administrative claims are attorney fees.  In accordance with Section 1123(a)(1) of the Bankruptcy Code, these claims have *not* been classified.

12

# ARTICLE III

## Treatment of Certain Unclassified Claims

(a) - *Administrative Claims Against the Debtor in Possession.*  Unless otherwise agreed or otherwise provided herein, the holders of allowed Administrative Claims against the Debtor in Possession entitled to priority under Section 507(a)((2) of the Bankruptcy Code, if any, shall receive on account of such allowed Administrative Claims or administrative expenses, cash in an amount of such allowed Administrative Claims or expenses on the Effective Date of the Plan, or alternatively, as the parties may agree, based on estimates and an appropriate schedule of distributions.  Allowed Administrative Claims in connection with fees for services rendered after the Confirmation Date, but prior to the Effective Date may be paid by the Debtor as an ordinary operating expense, if not otherwise ordered.  Professional fee expenses for services rendered after the Effective Date may be paid by the Debtor in Possession as an ordinary operating expense, if not otherwise ordered.

(b) - *Bar Date for Filing Applications for Allowance and Payment of Administrative Expense Claims.*  Applications for allowance and payment of Administrative Claims must be filed on or before the Effective Date.  The Court shall not consider any applications for allowance of Administrative Claims filed after the Effective Date.  Debtor in Possession and other interested parties shall have 20 days from and after the Effective Date in which to object to Administrative Claims.

(c ) - The Section 507(a)(2)/503(b) administrative priority c*laims.*  There are no administrative priority claims pursuant to Bankruptcy Code Section 507(a)(2) and 503(b) due to the Debtor being a non-profit corporation, other than anticipated attorney fees following Court approval (See below).

(d) -  <u>Court Approved Fees for Professional Services.</u>  Court approved fees for professional services of attorney(s) and CPA(s) for Debtor in Possession.  Unless otherwise agreed, or ordered, the balances due on these claims shall be paid in full, in a lump sum, on the Effective Date of the Plan.

## ARTICLE IV

### Treatment of Unimpaired Claims

There are no unimpaired claims.

## ARTICLE V

### Treatment of Impaired Claims

**(a) Class 1.**          The allowed claim of the creditor in this Class is impaired and shall be paid for a period of 10 years, together with simple annual interest at the rate of 5.25% and amortized over a thirty year period with a balloon payment being due at the end of the 10 year period of payments, at which point any outstanding balance shall be paid in full.

This allowed secured claim shall be paid in equal installments of Four Thousand Dollars ($4,000.00) per month, commencing with the month following the Effective Date of the Plan ("EDP").  There shall be no penalty for pre-payment.

The assets serving as collateral for this indebtedness are real estate properties and both shall continue to serve as collateral until complete payment under the note is completed, at which point the creditors shall release any and all liens and claims to the collateral and the debtor in possession.

Debtor shall keep the respective items of collateral insured to at least an amount sufficient to cover the unpaid balance of the allowed secured claim, until such

14

time as the allowed secured claim is fully paid.  Debtor will pay the insurance premiums in the ordinary course of business.

The monthly payments shall be in accordance with the following schedule:

**$4,000 due monthly on the 4th Monday of the month.**

Debtor will be able to make these payments, because they have been doing so under the Agreed Cash Collateral Order to date.

**(b)Class 2 -**   Class 2 claims consist of the allowed secured claim and interests of First National Bank of Omaha. The allowed secured claim of the creditor in this Class is impaired and shall be fully paid to the extent of the balance of the debt, together with simple annual interest at the rate of 5.25% and amortized over a five year period.

This allowed secured claim shall be paid in sixty (60) installments, in equal monthly amount of $286.52, commencing with the month following the Effective Date of the Plan ("EDP"), and continue each consecutive month thereafter. There shall be no penalty for pre-payment.

The asset serving as collateral for this indebtedness is all inventory, equipment, accounts, and other general non-real estate property listed under a UCC-1 filing and it shall continue to serve as collateral until the Plan payments are completed, at which point the creditors shall release any and all liens and claims to the collateral by appropriate filing with the Nebraska Secretary of State.

**(c)Class 3 -**      The timely filed and duly allowed claim(s) of the general unsecured, non-priority creditors shall be paid as follows: These allowed claims, if any, will be paid, in full, without interest, in one lump sum amount, commencing with the last business day of the month following the Effective Date of the Plan.  However, TCOO reserves the right to pre-pay said amount to any claim in this class, or the entire class of claims, without penalty for pre-payment.  If TCOO and any creditor in this class negotiate a pre-paid lump sum in a lesser amount, this cancellation of debt, if any, shall be pursuant to this insolvency proceeding under the auspices of Title 11 of the United States Code and accordingly, shall be without tax consequence.

**Class3 creditors/claims are as follows:**

| Creditor: & Claim No. | | Unsecured Claim(s) Amount: & % of total unsecured claims | Monthly Payment Amount: |

| Creditor: | Claim No. | Unsecured Claim(s) Amount: | % of total unsecured claims: |
|---|---|---|---|
| Yellow Book | 1 | $411.00 | 33% |
| Quill Corp. | unfiled | $628.28 | 49% |
| Mr. Rooter | unfiled | $222.94 | 18% |
| | TOTAL | $1262.22 | |

## ARTICLE VI

### Acceptance or Rejection of the Plan

(a) *Impaired Classes/Acceptance*.  Claims and interest holders in impaired classes are entitled to vote as a class to accept or reject the Plan.  In accordance with the provisions of Section 1126 of the Bankruptcy Code, an impaired class of claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims of such class and that have timely and properly voted on the Plan.

(b) *Unimpaired Classes/Presumed Acceptance*.  Pursuant to Section 1126(f) of the Bankruptcy Code, unimpaired classes of claims and interest holders are conclusively presumed to accept the Plan, and the votes of these claim holders will not be solicited.

(c) *Confirmation Option Notwithstanding Rejection*.  To the extent that any impaired class rejects the Plan, or is deemed to have rejected the

16

Plan, the Debtor will nevertheless request confirmation of the Plan, pursuant to Section 1129(b) and other relevant sections of the Bankruptcy Code, permitting cram down over any objections.

## ARTICLE VII

## Means for Plan's Implementation

The Debtor shall retain all of the estate's property, to operate the business and generate income to carry out the Plan's terms and make the Distributions to creditors. The Debtor satisfies and modifies various liens, modifies instruments, cures and waives various defaults, extends maturity dates, changes interest rates and other terms of notes, all as provided in this Plan and as authorized by 11 U.S.C. Section 1123(a)(5).

## ARTICLE VIII

## Retention of Jurisdiction

Pursuant to 11 U.S.C. Sections 105 and 1142, the United States Bankruptcy Court for the District of Nebraska shall continue to retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, notwithstanding entry of a Confirmation Order and the arrival of the Effective Date, including, among other things, jurisdiction to:

(a)  allow, disallow, determine, liquidate, classify, estimate or establish the validity of, or priority or secured or unsecured status of any claim or interest not otherwise allowed under the Plan, including the resolution of any request for payment of any administrative claim and the resolution of any objections to the allowance or priority of claims or interests; and,

 (b)  hear and determine all applications for compensation and reimbursement of expenses of professionals under the Plan or provision of the Bankruptcy Code, *provided however*, that from and after confirmation, the payment of fees and

expenses of retained professionals, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)  hear and determine disputes regarding effective performance of and payments pursuant to the provisions of the Plan;

(d)  hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, this Chapter 11 case;

(e)  enter such Orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan or the reorganization effort;

(f)  hear and determine disputes arising in connection with the Plan or reorganization effort;

(g)  consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Order, including the Confirmation Order;

(h)  issue injunctions, enter and implement other Orders, or otherwise exercise the powers of the Bankruptcy Court to restrain interference by any entity or individual with the Debtor's implementation, consummation, or enforcement of the Plan, the Confirmation Order, or the reorganization effort;

(i)  hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

(j)  hear and determine such matters as may be provided in the Confirmation Order, or as may be authorized under provisions of the Bankruptcy Code;

(k)  enter a final decree closing the Chapter 11 case.

## ARTICLE IX

## Miscellaneous Provisions

1. <u>Effective Date of the Plan</u>.  The Effective Date of the Plan shall be thirty-one days following entry of the Confirmation Order.  If the thirtieth day falls on a weekend or holiday, then the thirty-first day shall be one business day after business day which would become the thirtieth day.

2. <u>Modifications and Amendments</u>.  Debtor reserves the right to modify or amend its proposed Plan in any manner not inconsistent with 11 U.S.C. Section 1127.

3. <u>Disallowed Claims</u>.  Any claims which are not timely filed, not provided for herein, or otherwise are disallowed, shall not be entitled to receive any distributions under this Plan and shall be fully discharged and forever barred, following the entry of the discharge in this case.

4. <u>Notices</u>.  Any and all notices to the Debtor in matters pertaining to this Plan or this reorganization case (except notices provided by the Clerk of the U.S. Bankruptcy Court for the District of Nebraska utilizing the CM/ECF electronic noticing system) shall be provided to both the Debtor at its address of record herein, and to Debtor's undersigned counsel at his address of record.  If the address of record changes for either the Debtor or its counsel, said party will send notice to all parties in interest herein.  See Miscellaneous Provision Number 7, *infra.*

5. <u>Term of the Stay</u>.  Unless otherwise provided in this Plan, or in the Confirmation Order, all stays are injunctions provided for in the Bankruptcy Code shall remain in full force and effect until the Effective Date of the Plan.

6. <u>Defaults</u>.  Any existing default that has not been cured or otherwise provided for in this Plan is waived, except as otherwise provided. In the event of any future material default in the implementation and/or performance or execution of the terms and obligations of this Plan, the creditor or claim holder may file a motion for appropriate relief with the Bankruptcy Court - consistent with the rules of motion practice - following 15 days notice to the Debtor and Debtor's counsel and the subsequent failure of the Debtor to cure the existing default within said period, except as otherwise specifically provided in this Plan concerning any particular, creditor, claim or class.

7. <u>Addresses</u>.  The addresses to use for Notices to The Church of Omaha, A United Pentecostal Church, Inc. are:

    The Church of Omaha,
    A United Pentecostal Church, Inc.
    c/o Pastor Myron Powell
    3715 No. 104th Ave.
    Omaha, NE  68134

      and

    The Church of Omaha, A United Pentecostal Church, Inc.

    c/o David G. Hicks
    Pollak & Hicks, P.C.
    216 Overland Wolf Centre
    6910 Pacific Street
    Omaha, NE  68106

Dated:  June 29th, 2012.

The Church of Omaha,
A United Pentecostal Church, Inc.
Debtor and Debtor in Possession


By:    */s/ David G. Hicks*
DAVID G. HICKS, #16853
ROXANNE M. ALHEJAJ, #23353
POLLAK & HICKS
216 Overland Wolf Centre
6910 Pacific Street
Omaha, NE 68106
(402) 345-1717 (telephone)
(402) 444-1724 (facsimile)
DHicksLaw@aol.com
Attorneys for Debtor/D.I.P.


### Certificate of Service

The undersigned hereby certifies that the Chapter 11 Plan With Combined Disclosure Statement was served upon parties in interest by electronically filing it with the Clerk of the U.S. Bankruptcy Court for the District of Nebraska utilizing the CM/ECF system on the 29th day of June, 2011, and by mailing a copy to all parties on the attached matrix, that same date, by regular, first-class U.S. mail, postage prepaid.


*/s/ David G. Hicks*
David G. Hicks

# Exhibit "A"

## FINANCIAL/CASH FLOW PROJECTIONS/ANALYSIS

## "Proposal for Continued Sustainable Growth"

Prepared by Ron Christensen, Treasurer

And

Pastor Myron Powell, President

And

Members of the Board

Proposal for continued sustainable growth

On June 23, 2010, I became the Lead Pastor of The Church of Omaha (TCOO) by a percentage of 95%. The first service I was on site for was July 4, 2010. The week in between, 50 people had stopped coming to church. The effect this had on the morale, not to mention the finances, was troubling. Our attendance dipped to around 70 regular weekly members. As well, during the remaining months of 2010 and into 2011, five families suffered job losses that adversely affected the financial base of TCOO.

Equipped with a passion to pursue God's will and see our church rise again, I began to adamantly teach on vision and faith. God honored our efforts and by the middle of 2011, things were climbing again. The unemployed families were finding work, and new people were starting to visit TCOO.

We are now averaging 105 every Sunday and have seen our financial base level out and become stronger. In addition to this, Little Acorns Daycare has opened and is beginning to gain momentum. We are licensed for 12 children and currently have 11 signed up (some of these are not full-time, though).

Our attendance records, our financial records, and our visitors record all show increases over the previous year. Just this past week, another new family joined our church. They received one of our "door-hangers" which have been dispersed throughout a five-mile-radius of TCOO. So far in 2012, we have reached out to our community with over 5,000 door hangers. We have registered nearly 200 first-time visitors, of which nearly 50% of them have come back for at least a second time.

Three different pastors, not known to each other, have all prophesied this year concerning the spiritual, numerical, and financial growth of TCOO. As we continue to grow, we have implemented the following things to ensure that growth is sustainable:

1. Active praying to both seek God's will and to invite His wisdom, correction, blessing, and assistance in all that we do.
2. An active youth and children's ministry to assist families.
3. Little Acorns Daycare - specifically, future growth possibilities. As we complete other projects, we will be licensed for 80 after-school students. In our zip code, there is over 100 families on waiting lists for after-school programs.
4. Active outreach and personal evangelism. This includes giving out water (which has been donated) to those in need, putting door hangers throughout neighborhoods, and personally inviting people to become a part of TCOO.
5. Active teaching on the subject of consistent giving, as well as other means of communicating financial needs. Actively asking for people to commit to giving faithfully and consistently.

So far in 2012, we have realized an increase of $9,066 compared to the same six months last year. As we continue to grow, we will continue to see these increases. As we see these increases, not only will be able to pay off our debts faster, but also be able to support the kingdom of God both locally and globally more effectively.

We project the following goals for the remainder of this year and for the next five years:

| Year | Visitors | Members | Financial |
|------|----------|---------|-----------|
| 2012 | 200 | 125 | $6,000 in our savings, $10,000 per month in regular offerings |
| 2013 | 400 | 150 | $12,000 in our savings, $12,500 per month in regular offerings |
| 2014 | 600 | 200 | $18,000 in our savings, $15,000 per month in regular offerings |
| 2015 | 800 | 250 | $24,000 in our savings, $17,500 per month in regular offerings |
| 2016 | 1,000 | 300 | $30,000 in our savings, $20,000 per month in regular offerings |
| 2017 | 1,200 | 350 | $36,000 in our savings, $22,500 per month in regular offerings |

2

# EXHIBIT "B'

**Monthly Income/Expense Report**

**Prepared by**

**Ron Christensen, Treasurer**

1

# The Church Of Omaha

## Monthly Income/Expense Report

Beginning Balance, January 1, 2010                    6,420.93

| Month | Monthly Income | Monthly Expenses | Difference |
|---|---|---|---|
| January 2010 | 13,849.52 | 15,081.83 | 1,232.31 |
| February 2010 | 15,232.02 | 12,474.69 | 2,848.33 |
| March 2010 | 20,714.23 | 27,160.20 | 6,445.97 |
| April 2010 | 14,505.49 | 15,447.90 | 942.41 |
| May 2010 | 14,847.74 | 9,512.11 | 5,335.63 |
| June 2010 | 37,578.39 | 40,218.52 | 2,640.13 |
| July 2010 | 17,926.30 | 19,044.18 | 1,117.88 |
| August 2010 | 19,261.63 | 19,013.67 | 247.96 |
| September 2010 | 8,321.29 | 9,419.50 | 1,098.21 |
| October 2010 | 8,197.28 | 9,673.16 | 1,475.88 |
| November 2010 | 12,123.00 | 8,945.20 | 3,177.80 |
| December 2010 | 7,326.59 | 9,906.68 | 2,580.09 |
| January 2011 | 9,619.98 | 9,804.55 | 184.57 |
| February 2011 | 9,327.23 | 9,218.88 | 108.35 |
| March 2011 | 13,642.13 | 13,175.00 | 467.13 |
| April 2011 | 12,548.16 | 13,150.60 | 602.44 |
| May 2011 | 9,881.42 | 9,948.37 | 66.95 |

Jun 28 12 11:52a    Reg Christensen    p.3
Case 11-83138-TLS    Doc 18    Filed 06/29/12    Entered 06/29/12 16:04:26    Desc Main
Document    Page 28 of 28

2

| | | | |
|---|---|---|---|
| June 2011 | 11,622.28 | 11,653.59 | 31.31 |
| July 2011 | 14,007.90 | 14,015.47 | 7.57 |
| August 2011 | 14,601.86 | 14,320.49 | 281.37 |
| September 2011 | 11,796.33 | 12,088.61 | 292.28 |
| October 2011 | 10,078.35 | 8,742.39 | 1,335.96 |
| November 2011 | 9,219.52 | 10,261.29 | 1,041.77 |
| December 2011 | 10,447.81 | 10,659.92 | 212.11 |
| January 2012 | 12,756.33 | 12,645.43 | 110.90 |
| February 2012 | 13,999.23 | 14,199.90 | 200.67 |
| March 2012 | 12,835.40 | 12,539.37 | 296.03 |
| April 2012 | 16,383.24 | 16,320.24 | 63.00 |
| May 2012 | 9,541.15 | 8,990.70 | 460.45 |
| June 2012 | 12,961.63 | 13,411.51 | 449.88 |